UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
MOBILE DIVISION

In re:

KATTIE M. WHITE,                               Case No.: 10-00889-MAM-7

    Debtor.

CARL EDWARDS,

    Plaintiff,

v.                                               Adv. Proc. No.: 10-00059

KATTIE M. WHITE,

    Defendant.

**ORDER AWARDING JUDGMENT OF NONDISCHARGEABILITY TO PLAINTIFF**

Theodore L. Hall, Attorney for the Debtor, Mobile, Alabama
Katherine Amanda Herndon, Attorney for the Plaintiff, Mobile, Alabama

    This case is before the Court on the Plaintiff's complaint to determine the dischargeability of a debt owed to the Plaintiff by the Debtor. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. The Court has the authority to enter a final order pursuant to 28 U.S.C. § 157(b)(2)(I). For the reasons indicated below, the Plaintiff's requested relief is due to be GRANTED.

1

# FACTS

Prior to filing for Chapter 7 bankruptcy relief, Debtor Kattie White ("Debtor") was a branch manager for Home Loan USA LLC ("Home Loan"). The Debtor acted as a mortgage broker and originator for Home Loan. Sometime in or around 2009, Debtor was diagnosed with Graves' disease and was forced to leave Home Loan. The Debtor has an extensive background in finance and real estate, including working with home mortgages. She previously held Series 7, 63, and 66 licenses, but allowed them to lapse in November of 2009 due to her illness. She currently operates Integral Financial Solutions, Inc., a real estate finance company.

The Debtor employed Sakeena Powe ("Ms. Powe") as an independent contractor while working for Home Loan. Ms. Powe began working for the Debtor in 2007 and was terminated sometime in 2008. Ms. Powe testified that she had minimal experience with mortgages and real estate finance. The Debtor explained that Ms. Powe's duties were to bring in business and to help with the pre-qualification process for loan applicants.

In a deposition conducted prior to the Debtor's bankruptcy filing, the Debtor denied having employed any person named Powe. Rick Holston, one of the attorneys who conducted the deposition, testified that it was made clear that the questions referred to a Powe that the Debtor had, at some point, employed. The Debtor admitted at trial that she did employ Ms. Powe at Home Loan. She further explained that her deposition testimony was based upon her understanding that she was being asked about a person named "Poe" rather than "Powe." She explained that her confusion was likely due to her medical condition.

Plaintiff Carl Edwards ("Plaintiff") currently works as a ship captain. In 2007, Plaintiff was a deckhand, and worked roughly 240 days a year offshore. The Plaintiff never graduated from high school and did not have a G.E.D. in 2007. He is married to Marlene Edwards ("Mrs.

2

Edwards") and has been since March of 2005. The Edwards currently live at 1705 Winston Road, Mobile, Alabama 36605 (the "Winston Road property").

Before August of 2007, the Edwards rented the Winston Road property from Martha McCoy pursuant to a "Lease with Option to Purchase" agreement that was executed in March of 2006. Martha McCoy lives in Lithia Springs, Georgia and is the mother-in-law of Ledora McCoy. Ledora McCoy is the Plaintiff's sister and lives in Mobile, Alabama. Ledora McCoy and Mrs. Edwards worked together at a church daycare center in 2007. The Lease with Option to Purchase agreement between the Edwards and Martha McCoy quoted a $70,000 purchase price for the Winston Road property. The Plaintiff testified that beyond executing the Lease with Option to Purchase agreement, he never spoke to Martha McCoy regarding the purchase price of the Winston Road property. The Edwards never purchased a home prior to the Winston Road property.

Sometime in June of 2007, the Plaintiff phoned the Debtor's Home Loan office to inquire about financing the purchase of the Winston Road property. The Plaintiff spoke to Ms. Powe and offered some basic financial information and the Debtor ran a credit check based on that information. On July 5, 2007, the Edwards and Ledora McCoy went to the Debtor's Home Loan office. Ledora McCoy accompanied the Edwards to Home Loan because she had more experience with home buying than the Edwards, having purchased a home previously. At Home Loan, the group met with Ms. Powe and the Debtor. The Plaintiff testified that he went to Home Loan with the intention of borrowing $60,000 to purchase the Winston Road property. He felt that the home needed repairs and consequently was not worth the $70,000 purchase price recited in the Lease with Option to Purchase agreement. The Plaintiff testified that he told the Debtor

3

Case 10-00059    Doc 100    Filed 12/01/11    Entered 12/01/11 09:09:02    Desc Main
Document    Page 3 of 18

and Ms. Powe that he only wanted to borrow $60,000. Ledora McCoy, Ms. Edwards, and Ms. Powe corroborated the Debtor's testimony.

The Plaintiff testified that the Debtor convinced him to borrow $72,000 instead of $60,000 so that he could use the difference to perform repairs on the Winston Road property. According to the Plaintiff, the arrangement would work as follows: (1) the Plaintiff would borrow $72,000, (2) those funds, less closing costs, would be sent to the seller Martha McCoy, (3) Martha McCoy would retain $60,000 for the home, and (4) Martha McCoy would remit the remainder to the Plaintiff for repairs. The Plaintiff insisted that the agreement be memorialized in writing and explained that the Debtor told him she would draft the agreement. The Plaintiff referred to the written document as an "addendum." It was clear and well written. The Plaintiff explained that he would not have borrowed $72,000 if he did not believe he would get money back for repairs.

John Cambridge, a home loan finance expert retained by the Plaintiff, testified that the Debtor "locked" the Plaintiff into borrowing $72,000 on June 27, 2007. According to the Plaintiff, June 27, 2007 was prior to the Debtor receiving a fully executed sales contract or an appraisal of the Winston Road property. He explained that the lock reserved money to be used for the Plaintiff's loan at a particular interest rate. He stated that the lock was set to expire on August 27, 2007. He further explained that the lock did not obligate the Plaintiff to borrow $72,000, and that the Plaintiff would have suffered no adverse consequences if it expired. However, the Debtor, as a broker, would have been penalized for locking a loan that did not ultimately close.

In contrast, the Debtor testified that the Plaintiff never told her that he wanted to borrow $60,000. She stated that the purchase price was always at least $70,000. The Lease with Option

4

to Purchase agreement and all of the subsequent loan documents recite a purchase price of at least $70,000. The Debtor indicated that until the Plaintiff brought it to her attention after the closing she had no knowledge of the addendum or any side agreement where the Edwards would get money back from Martha McCoy.

Ultimately, the Plaintiff completed a loan application on July 5, 2007. The Debtor testified that he was initially approved for a $68,400 dollar loan. She explained that the loan would only provide 95% financing, requiring the Edwards to make a 5% down-payment in addition to any closing costs.

After the July 5, 2007 meeting, the Plaintiff granted Ledora McCoy a special power of attorney to close the loan in his absence if he happened to be offshore and indisposed. Ledora McCoy testified that the power of attorney was the Debtor's idea and that the Debtor suggested an attorney to draft the paperwork.

Ms. Powe testified that, sometime after the July 2007 meeting, she and the Debtor took the addendum to the church daycare center where Ledora McCoy and Mrs. Edwards were working. The Plaintiff was offshore at the time. Included with the addendum was a redacted fax cover sheet. The fax cover sheet instructed Ledora McCoy to send the addendum to Martha McCoy with instructions for Martha to sign it and send it back to Ms. Powe and the Debtor. Ledora McCoy testified that she, pursuant to the power of attorney, signed the addendum on the Plaintiff's behalf. Ledora McCoy also testified that, at Ms. Powe's direction, she faxed the addendum to Martha McCoy.

The Plaintiff's initial loan application was rejected. The Debtor explained that the Edwards did not have enough reserve money to receive a final approval of the loan. However, shortly thereafter, the Debtor found alternate financing for the Plaintiff through Fannie Mae. The

5

Fannie Mae loan was a 100% loan, requiring no down payment. The Plaintiff was ultimately approved for that loan. The Debtor acted as originator for the Fannie Mae loan.

The Fannie Mae loan required the Plaintiff to pay a larger portion of the closing costs than the first loan did. The Edwards initially expected to pay $3,330 for closing costs and had that amount in savings. However, the week prior to the final closing date, the Debtor asked the Edwards to bring $4,795 to pay the closing costs rather than $3,330. In order to make up the difference, the Plaintiff pawned his truck title to Alabama Title Loan.

John Cambridge, the Plaintiff's expert, testified that according to the sales contract, the seller, Martha McCoy was supposed to pay 6% of closing costs. He explained that under a conventional loan, like the Fannie Mae loan the Debtor applied for, a seller may only pay 3% of closing costs. Despite the 6% notation, it appeared to Cambridge that Martha McCoy only paid 3% of closing costs and that the Plaintiff paid the remainder.

The closing occurred on August 15, 2007. The Plaintiff, Mrs. Edwards, the Debtor, and Binky Clark were present at the closing. Both Mr. and Mrs. Edwards signed the mortgage loan documents to purchase the Winston Road property. The closing documents recited a loan amount of $72,000 and a purchase price of $72,000. The Plaintiff signed a document at closing that acknowledged that he was to get nothing back from the closing. The Plaintiff testified that no one explained the closing documents to him and his wife. The Plaintiff asserted that the Debtor led him to believe that the purchase price was $60,000 and that he would receive money back pursuant to the addendum. However, the Plaintiff did not have a copy of the addendum prior to closing and did not leave the closing with a copy of the addendum. In fact, approximately ten days passed between the closing and the Plaintiff's receipt of a copy of the addendum.

6

Case 10-00059   Doc 100   Filed 12/01/11   Entered 12/01/11 09:09:02   Desc Main
Document      Page 6 of 18

The Plaintiff never received any money back from Martha McCoy after the closing. The Edwards contacted the Debtor shortly after the closing to inquire about the money. The Debtor contacted Martha McCoy on behalf of the Edwards. She explained to the Edwards that Martha McCoy did not plan to remit any money to the Edwards. The Debtor testified that she knew nothing of the agreement, but advised the Edwards that if they had made a side agreement with Martha McCoy, that they should get an attorney to enforce it. Thereafter, the Debtor stopped taking the Edwards' phone calls.

The Plaintiff sent a certified letter to the Debtor, Home Loan, and Martha McCoy on November 7, 2007 explaining that when he went to Home Loan he was only interested in borrowing $60,000. The letter stated that, in the Plaintiff's opinion, the Debtor talked him into borrowing $72,000. It recites that the Plaintiff expected to receive $9,800 after closing and that the Debtor prepared a document that reflected his understanding of the agreement. The Edwards received no response from the first mailing of the certified letter. As a result, on January 7, 2008, Mrs. Edwards hand delivered the letter to the Debtor's office.

On January 28, 2008, the Plaintiff filed a lawsuit in Mobile County Circuit Court naming the Debtor, Home Loan, and Martha McCoy as defendants. The Plaintiff alleged breach of contract, negligence/wantonness, and fraud/misrepresentation stemming from the Winston Road property purchase. The Plaintiff sought compensatory and punitive damages. Martha McCoy was dismissed from the action through summary judgment because the state court found that she did not sign the addendum.

On February 22, 2010, the Plaintiff and the Debtor entered into a settlement agreement regarding the state court action. The Plaintiff submitted a transcript of the parties announcing their agreement on the record in state court as well as a draft settlement order stating, among

7

Case 10-00059    Doc 100    Filed 12/01/11    Entered 12/01/11 09:09:02    Desc Main
Document      Page 7 of 18

other things, that the Debtor would pay the Plaintiff $5,000 on or before March 2, 2010, and $10,000 within 30 days of March 2, 2010, in full settlement of claims against the Debtor and agreeing to a confidentiality agreement. Rick Holston, an attorney representing the Plaintiff in the state court action, testified that the settlement agreement, including its installment plan and associated dates, was proposed by the Debtor's attorney. The settlement agreement stated that a consent judgment would be entered against the Debtor if she failed to meet its terms.

The Debtor testified that she was in severe financial distress on the date of the state court trial. Indeed, on July 25, 2011, the Debtor filed a "Declaration under Penalty of Perjury" with this Court stating, in part, the following: "At the time I entered into the settlement agreement...I had approximately $100,000 in unsecured debt. I was in severe financial distress and was contemplating Chapter 7 relief." As early as 2009, in conjunction with her illness, the Debtor was forced to quit working. She incurred numerous medical bills and defaulted on her home mortgage. She met with a bankruptcy attorney to stop the foreclosure of her home, but decided not to file bankruptcy at that time because her mortgage company offered to allow her to apply for a loan modification. She applied for the loan modification in late 2009. The Debtor testified that her plan was to obtain the loan modification and then to file bankruptcy afterward because even with the modification she could not handle the medical bills that she owed. As of the February 22, 2010 state court date, the loan modification had not received final approval. The Debtor testified that she eventually received a loan modification in April of 2010.

On February 26, 2010, the Debtor obtained credit counseling and on March 2, 2010, she filed a voluntary Chapter 7 petition. She listed the Plaintiff as an unsecured creditor holding a claim of $15,000, representing the settlement amount. The Debtor also listed the Circuit Court litigation as a suit to which she was a party in the year preceding her petition. March 2, 2010 is

8

Case 10-00059    Doc 100    Filed 12/01/11    Entered 12/01/11 09:09:02    Desc Main
Document    Page 8 of 18

the same day that the Debtor was slated to pay the Plaintiff the first payment pursuant to the settlement agreement. The Debtor testified that she believed she could pay the Plaintiff that day. She stated that in previous years she received a bonus from Blue Cross Blue Shield of Tennessee in an amount that would have allowed her to pay the Plaintiff. She produced evidence showing that in previous years she received roughly $3,500. However, in March of 2010, the Debtor received approximately $800.

The Plaintiff filed this adversary proceeding on June 4, 2010, objecting to the dischargeability of his debt in the Debtor's bankruptcy case pursuant to 11 U.S.C. § 523(a)(2)(A) and § 523(a)(4). The Plaintiff alleged that the Debtor's discharge should be denied because (1) he entered into the settlement agreement with no intention to pay the resulting obligation, (2) he suffered damages as a result of the Debtor's fraud and misrepresentations in conjunction with the underlying loan transaction, and (3) that the Debtor was a fiduciary who committed fraud or defalcation.

The Plaintiff testified that he and his wife suffered damages resulting from the failed settlement agreement and loan transaction. First, the Plaintiff explained that he was owed $15,000 pursuant to the settlement agreement that he was never paid. Second, he alleged damages stemming from the underlying fraud in the loan transaction. He explained that he borrowed $12,000 more than he intended and expected to receive at least $9,800 in return for repairs but never received any money back. He stated that the additional borrowing resulted in an unintended increase in his monthly mortgage payment. He further explained that the title loan he entered into with Alabama Title Pawn required repayment of principal ($940) and interest ($1,050). Moreover, the Plaintiff presented evidence that the $72,000 loan obligated him to pay $11,172.49 more in private mortgage insurance ("PMI") than a $60,000 loan would have

9

required.[1] The Plaintiff also testified that he has worked more hours to make ends meet and has suffered stress and emotional hardship. The Plaintiff's alleged actual damages stemming from the underlying fraud sum $14,115, excluding PMI, and $25, 287.49 including PMI.

The Debtor filed a motion for summary judgment as to the Plaintiff's claims and the Plaintiff filed a response. On August 11, 2011, this Court disposed of Plaintiff's § 523(a)(4) allegation through summary judgment finding that Debtor did not act in the fiduciary capacity contemplated under § 523(a)(4). This Court denied summary judgment as to the Plaintiff's § 523(a)(2)(A) allegations because questions of material fact remained as to the Debtor's subjective intent.

## LAW

The Plaintiff seeks a determination of nondischargeability. At the outset it is important to note that "courts generally construe the statutory exceptions to discharge in bankruptcy liberally in favor of the debtor, and recognize that the reasons for denying a discharge…must be real and substantial, not merely technical and conjectural." *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994).

The Plaintiff's complaint invokes 11 U.S.C. § 523(a)(2)(A) as authority for his requested relief. Section 523(a)(2)(A) states that a particular debt may be precluded from discharge if it is a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by false pretenses, a false representation, or actual fraud." In order to succeed, the Plaintiff must prove the following elements by a preponderance of the evidence: (1) the debtor made a false representation with the intent to deceive the creditor, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a

---

[1] The Debtor argued that the Plaintiff's PMI calculation was far too speculative because it did not represent the present value of those figures and did not take into account other relevant factors that could alter the value and its repayment.

result of the misrepresentation." *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998); *In re Garrett*, 2011 WL 3586178, at *2 (S.D. Ala. August 16, 2011).

The Debtor's bankruptcy schedules include a $15,000 debt owed to the Plaintiff stemming from the state court action and settlement agreement. The Plaintiff avers that the $15,000 debt is nondischargeable because the Debtor fraudulently entered into the state court settlement having no intention of paying the resulting debt. Second, the Plaintiff asserts that he is entitled to a judgment of nondischargeability regarding actual damages stemming from the Debtor's fraud and misrepresentations in the underlying loan transaction. The Court will address each allegation separately.

### A.

The Plaintiff insists that the Debtor entered into the state court settlement "under false pretenses and committed actual fraud by obtaining a monetary debt that she had no intention of paying." "Proof of fraud in cases involving unfulfilled promises requires a plaintiff to prove that when a defendant made promises he knew he could not fulfill them or had no intention of fulfilling them." *In re Little*, 2011 WL 1139817, at *3 (Bankr. M.D. Fla. March 24, 2011). Specifically, the Plaintiff must prove by a preponderance of the evidence that the "debtor incurred the debt 'without the *actual subjective intent* to pay the debt thereby incurred.'" *In re Frizzell*, 2006 WL 6589889, at * 3 (Bankr. N.D. Ga. August 8, 2006) (emphasis added). As defendants generally avoid any admission that they incurred debt while having no intention to pay it, this Court may infer the requisite subjective intent from the totality of the circumstances. *Id.*; *In re Dennis*, 444 B.R. 210, 216 (Bankr. N.D. Ala. 2011). Though not an exhaustive list, the following factors are relevant to the inquiry:

> 1) the length of the time between the incurring of the debt and the filing of bankruptcy; 2) whether or not the debtor consulted an

>attorney concerning the filing of bankruptcy before incurring the debt; 3) the number of transactions; 4) the amount of the debt; 5) the financial condition of the debtor at the time the debt was incurred; 6) whether or not the debtor was employed; 7) the debtor's prospect for employment; 8) the financial sophistication of the debtor.

*Id.*; *In re Ettell*, 188 F.3d 1141 (9th Cir. 1999).

In this case, the Plaintiff presented the following evidence in support of its assertion that the Debtor never intended to satisfy the settlement agreement: (1) the Debtor consulted her bankruptcy attorney several times contemporaneous to the settlement and her bankruptcy filing, (2) the Debtor filed her petition on March 2, 2010, eight days after entering into the settlement agreement on February 22, 2010, (3) the Debtor filed her petition on the date that the first payment to the Plaintiff pursuant to the settlement agreement was due, (4) the Debtor's attorney proposed the installment payments and associated dates for the settlement agreement, (5) the Debtor undertook credit counseling[2] on February 26, 2011, four days after the settlement agreement and four days before filing for bankruptcy, (6) the Debtor's financial condition was very poor on the day she entered into the settlement, including significant arrears on her home mortgage, (7) the Debtor's financial knowledge is well-above average, supporting an inference that she thoroughly understood the state of her financial condition on the date of settlement and her prospective ability to pay, and (8) the Debtor asserted in a affidavit submitted to this court in support of her motion for summary judgment that she was contemplating bankruptcy on the day of the settlement.

In response, the Debtor testified that she had every intention of paying the Plaintiff according to the settlement and believed that she would be able to meet the agreed upon

---

[2] Successful completion of the credit counseling course is mandatory before filing a bankruptcy petition.

**12**

deadlines. The Debtor's attested support for that statement is twofold. First, the Debtor explained that she was scheduled to receive a bonus check on March 2, 2010 that would have enabled her to make her first installment payment to the Plaintiff. She presented evidence indicating that in previous years she received a bonus that was consistently around $3,500. However, the bonus she received on March 2, 2010, was for approximately $800, an unexpectedly low amount. The Debtor testified that without the additional bonus money she expected to receive, she had no other funds to pay the Plaintiff on March 2, 2010.

Second, the Debtor asserted that her bankruptcy filing was not based upon the debt she owed to the Plaintiff. Instead, she explained that she had been contemplating bankruptcy for over a year based on other financial difficulties stemming from her illness and corresponding inability to work. She specifically indicated that she owed significant sums for medical bills. Further, she presented evidence indicating that her home was noticed for foreclosure in April of 2009 and that she contemplated bankruptcy to stall the foreclosure action. In line with that testimony, she explained that her first meeting with her bankruptcy attorney occurred contemporaneously with that notice. The Debtor testified that she decided not to file a bankruptcy petition at that time because she was able to negotiate a loan modification with the secured lender. The Debtor's plan was to file bankruptcy *after* her loan modification was approved because she wanted to save her home. According to the Debtor, the necessity of bankruptcy was due to the magnitude of her medical bills and other unsecured debt. The Debtor was not approved for the loan modification until after filing bankruptcy.

Plaintiff relied on the Debtor's representations regarding the settlement agreement. He chose not to pursue his state law claims to judgment based on the Debtor's representations. Further, it was justifiable for him to rely on the Debtor's representations because they were made

under oath and in open court. In particular, the fact that a consent judgment would follow the Debtor's failure to pay bolsters Plaintiff's reliance on the Debtor's assertions. Moreover, the Plaintiff was damaged by the Debtor's failure to pay. The Plaintiff failed to timely receive the payments that he bargained for by entering into the settlement agreement.

The lynchpin of the present inquiry is the Debtor's subjective intent. Indeed, the Plaintiff's burden is to show, by a preponderance of the evidence, that the Debtor never intended to pay the agreed upon settlement amount. While the Plaintiff succeeded in highlighting suspicious circumstances, the Debtor offered explanations for those circumstances that the Court finds to be countervailing. The Debtor believed that she would be able to meet the settlement obligations based on her bonus check, which was substantially larger in previous years. Further, the Debtor established that she had been contemplating bankruptcy for over a year based on her delinquent home note and substantial medical bills. The Court finds that when considering the totality of the circumstances the Plaintiff did not satisfy his burden to demonstrate that the Debtor entered the settlement agreement having no intention of fulfilling her obligations. The Debtor's testimony about her pre-bankruptcy situation was credible and matched the facts. Thus, the Debtor's discharge as to the $15,000 debt owed to the Plaintiff will not be denied on those grounds.

**B.**

The Plaintiff also seeks a nondischargeable judgment for the actual damages he suffered as a result of the Debtor's fraud and misrepresentations in the underlying loan transaction. Specifically, the Plaintiff asserts that the Debtor made fraudulent misrepresentations and falsified a legal document to induce the Plaintiff to borrow more money than he intended in purchasing the Winston Road property.

For a debt to be nondischargeable, the Debtor must have made a false representation with the intent deceive the creditor. *Bilzerian*, 153 F.3d at 1281. "A determination of fraudulent intent is an issue of fact and 'depends largely upon an assessment of the credibility and demeanor of the debtor.'" *Little*, 2011 WL 1139817, at *3 (quoting *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994)). The Plaintiff alleges that the Debtor induced him to borrow $72,000 to purchase the Winston Road property, rather than the $60,000 he intended, by crafting a scheme where he would receive money back from the seller in order to complete house repairs. According to the Plaintiff, the Debtor drafted an addendum to the loan documents memorializing the agreement. Several witnesses echoed the Plaintiff's testimony including Ledora McCoy, Mrs. Edwards, and Sakeena Powe.

The Debtor denied having any knowledge of an agreement that would return funds to the Plaintiff after the closing. In fact, she testified that she did not draft the addendum document and denied ever seeing it until well after the closing. She refuted the Plaintiff's testimony that he expressed an intention to borrow only $60,000, explaining that the purchase price for the Winston Road property was always at least $70,000. She also pointed to the fact that the Plaintiff signed a document at closing that patently indicated that he would receive no funds back from the closing. Further, the closing documents recited a $72,000 dollar purchase price. The Debtor's testimony was not corroborated by any other witnesses.

Weighing the evidence presented by both parties, the Court finds that the Debtor made fraudulent representations to the Plaintiff with the intent to deceive. The evidence indicates that that the Debtor represented to the Plaintiff that if he borrowed $72,000, he would get money in return to make repairs on his home. The Court also finds that the Debtor engineered the agreement and authored, or at least directed the drafting of, the addendum. The Court finds it

unlikely, based on the testimony and demeanor of the Plaintiff, that he fabricated his story and the addendum document. Moreover, several witness, including Sakeena Powe, a former employer of the Debtor who participated in the transaction, verified the Plaintiff's testimony. The Court observed Ms. Powe's demeanor during trial and found her testimony credible. She appeared the most unbiased of the witnesses presented. In contrast, the Debtor's testimony was guarded and evasive. For instance, the Debtor failed to acknowledge that she knew Sakeena Powe, a former employee, during a deposition taken in the underlying state court case. Ultimately, the Court did not find the Debtor's testimony credible as to the facts surrounding the Plaintiff's loan transaction.

It is not enough that the Debtor made misrepresentations with the intent to deceive, however. To be excepted from discharge pursuant to § 523(a)(2)(A), the Plaintiff must have relied on the Debtor's representations and it must have been justifiable for him to do so. *In re Dennis*, 444 B.R. 210, 216 (Bankr. N.D. Ala. 2011) (citing *Field v. Mans*, 516 U.S. 59 (1995)). Justifiable reliance is a lesser standard than the customary reasonable reliance standard. *In re Hall*, 342 B.R. 653, 656 n.6 (Bankr. M.D. Fla. 2006). "[U]nder the justifiable reliance standard the 'plaintiff's conduct must not be so utterly unreasonable, in the light of the information apparent to him, that the law may properly say that his loss is his own responsibility." *Dennis*, 444 B.R. at 216 (quoting *In re Vann*, 67 F.3d 277 (11th Cir. 1995)).

In this case, the Court finds that the Plaintiff relied on the Debtor's representations and that his reliance was justifiable. The Plaintiff is not a sophisticated business man. At the time the loan transaction closed, the Plaintiff was not a high school graduate and had never purchased any real property. The Debtor acted as the originator for the Plaintiff's loan. In that capacity, she led the Plaintiff to believe that the addendum document would alter the closing documents such that

he would receive money back from the seller after closing. The Plaintiff relied on the Debtor's representation and acted accordingly. Given Plaintiff's education and business experience, it was not utterly unreasonable for him to believe the Debtor, a sophisticated mortgage broker and originator. It might not have been reasonable for the Plaintiff to sign paperwork containing terms that contradict his understanding of the agreement, however, given his education level and limited financial sophistication, his reliance on the Debtor's representations was justified under the circumstances.

It is also clear to the Court that the Plaintiff was damaged as a result of the Debtor's intentional misrepresentations. The Debtor's misrepresentations induced the Plaintiff to borrow $12,000 more to pay for the Winston Road property than he intended. The Plaintiff is now obligated to pay principal and interest over the life of the loan based on that higher amount. In addition, the higher loan amount required the Plaintiff to pay larger closing costs, which necessitated him acquiring quick cash the day of the closing by pawning his truck. Since then, he has had to repay that loan and its accompanying interest charges. Moreover, the Plaintiff has had to make other arrangements to address the repairs that he thought he was borrowing money to complete. The Plaintiff also seeks to recover the difference in the amount of PMI he is obligated to pay for the $72,000 loan versus his intended $60,000 loan.

The Court finds that the Plaintiff is entitled to a nondischargeable $14,115 judgment, representing the actual damages suffered by the Plaintiff due to the Debtor's intentional misrepresentations. The Court excluded the Plaintiff's request for PMI damages from the calculation as they are too speculative and may not ultimately be borne by the Plaintiff.

Therefore, it is ORDERED:

1. The Plaintiff is entitled to a $14,115 nondischargeable judgment together with taxable costs pursuant to § 523(a)(2)(A).

2. A judgment consistent with this order will be separately entered in favor of the Plaintiff.

Dated: December 1, 2011

/s/ Margaret A. Mahoney
MARGARET A. MAHONEY
CHIEF U.S. BANKRUPTCY JUDGE